2026 IL App (1st) 251311-U

FIRST DISTRICT,
SIXTH DIVISION
February 20, 2026

No. 1-25-1311

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| CLAUDETTE FAULKNER, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County, Illinois. |
| | ) | |
| v. | ) | No. 2009 D2 30557 |
| | ) | |
| ERNEST FAULKNER, | ) | Honorable |
| | ) | Jeanne Reynolds, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE GAMRATH delivered the judgment of the court.
Presiding Justice C.A. Walker and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1     *Held*:  Trial court did not err in finding that former husband violated terms of marital settlement agreement and enforcing the terms thereof.

¶ 2     Claudette and Ernest Faulkner were divorced after a 40-year marriage. The marital settlement agreement (MSA) stated the marital residence was to be listed for sale and the net sale proceeds were to be equally divided between the parties. Twelve years later, the residence had not been sold and remained in Ernest's sole ownership and possession. Claudette filed a motion

to enforce the MSA. Following a hearing, the court found Ernest breached the MSA and entered an order enforcing the terms thereof.

¶ 3    Ernest appeals, arguing he did not breach the MSA by keeping the residence and raising various contentions of procedural error. We find Ernest's interpretation of the MSA is without merit and the trial court properly entered judgment in favor of Claudette. Thus, we affirm.

¶ 4                                    I. BACKGROUND

¶ 5    Claudette and Ernest were married in 1970 and had two children, born in 1974 and 1975. The marital residence was purchased in 2003. Ernest was the sole titleholder.

¶ 6    In 2009, Claudette filed for dissolution of marriage. On April 19, 2012, a judgment of dissolution was entered, with the parties' MSA being incorporated into the judgment. In relevant part, the MSA states the residence shall be placed for sale on the open market; the parties shall execute a quitclaim deed giving each party a 50% interest in the property until it is sold; the parties "shall cooperate in the effective completion of the sale by doing any and all acts and things necessary or proper to effectuate the sale of said real estate"; and the net sale proceeds shall be divided equally between the parties. The MSA further directs Claudette to transfer $19,457.50 from her IRA to Ernest.

¶ 7    As of December 12, 2024, Ernest, who was 75 years old, retained ownership and possession of the residence, while Claudette, who was 77 years old and suffering from Parkinson's Disease, lived in an assisted living facility. On that date, Claudette filed the instant "Motion to Enforce Judgment and Marital Settlement Agreement" pursuant to sections 508 and 511 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/508, 511 (West 2024)). She alleged that Ernest unilaterally delisted the residence in November 2012, failed to

relist or sell the residence, failed to execute a quitclaim deed transferring the property into the names of both parties, and instead transferred the property into his own trust.

¶ 8          On February 7, 2025, due to the parties' advanced age and health issues, the court expedited the matter and scheduled a hearing for March 18, 2025. Five days before the hearing, Ernest filed an answer in which he "[a]dmitted that the property has not been sold as agreed to by the parties," but alleged they made an oral agreement "more than 12 years [ago]" that Ernest would keep the residence in exchange for Claudette keeping Ernest's $19,457.50 share of IRA funds. Based on this alleged oral agreement, Ernest raised affirmative defenses of laches, equitable estoppel, unclean hands, and *in pari delicto*. In the alternative, he raised a counterclaim for Claudette's $19,457.50 in IRA funds.

¶ 9          Ernest also moved to continue the hearing, stating he needed time to prepare his defense and conduct discovery. On the same day, Ernest served Claudette with a notice to appear pursuant to Rule 237(b) and (c) (eff. Oct. 21, 2021), seeking her attendance at the March 18 hearing and production of certain documents.

¶ 10          On March 17, Claudette filed an objection to Ernest's notice to appear, observing that Ernest waited until five days before the hearing to issue the notice, and arguing "[t]he timing suggests that Ernest's true intent is to manufacture a reason to delay enforcement *** rather than engage in legitimate fact finding." Claudette additionally filed an affidavit in which she alleged that Ernest was "physically, mentally and emotionally abusive" during the marriage. Claudette said she never agreed that Ernest could keep the residence, but when he delisted it in November 2012, she feared him and did not have the means to take him to court to enforce the judgment. Claudette stated she could testify to the contents of her affidavit, but she requested her presence

be excused from the March 18 hearing "for health reasons and [her] fear that the appearance will exacerbate [her] health issues."

¶ 11    The March 18 hearing proceeded as scheduled. Claudette was not present, but her counsel stated that, if necessary, they could attempt to have Claudette appear via Zoom. Ernest was present and testified on his own behalf. He produced a listing showing that on May 7, 2012, the residence was listed for $239,900. He claimed Claudette's counsel delisted the property, but also stated the listing "may have expired on its own." He admitted not transferring the residence into the names of both parties via quitclaim deed. Instead, on April 1, 2019, he transferred the residence into his own trust and has not sold it. He claimed that in "August or September 2012," he had a phone conversation with Claudette in which they agreed that he would keep the house and she would keep her IRA funds. This alleged agreement was not documented in a court order, and Ernest never contacted an attorney to formalize it.

¶ 12    On cross-examination, Ernest admitted sending emails to Claudette on December 6, 2012, December 13, 2012, and March 12, 2013, in which he demanded that Claudette pay him the IRA funds and threatened legal action if she did not pay. In these emails, Ernest did not mention any alleged agreement to allow Claudette to keep her IRA funds.

¶ 13    At the conclusion of Ernest's testimony, counsel for Claudette moved for a directed finding pursuant to section 2-1110 of the Code of Civil Procedure (735 ILCS 5/2-1110 (West 2024)). Over Ernest's objection, the court granted the motion, finding Ernest breached the MSA and his emails directly contradicted his testimony regarding the alleged oral agreement in "August or September 2012." After the court granted the directed finding, Ernest sought to call Claudette to the stand to testify. His request was denied.

¶ 14      The court entered a written order granting Claudette's motion to enforce the judgment and finding Ernest in contempt of court *sua sponte*. The court stated that Ernest admitted he did not comply with the MSA, and his testimony about the alleged oral agreement was not credible and "was directly refuted by his own emails to Claudette." The court ordered the parties to execute a quitclaim deed within seven days transferring the property into both parties' names and "immediately" list the residence to be sold with an agreed-upon listing agent. The court also granted Claudette leave to file a petition for attorney fees under section 508(b) of the Act (750 ILCS 5/508(b) (West 2024)).

¶ 15      Ernest moved to reconsider. On March 31, 2025, the trial court granted Ernest's motion in part and removed any language or findings of contempt from the March 18 order. The court also granted Ernest an additional 30 days (until April 29, 2025) to execute the quitclaim deed, work with Claudette to choose a listing agent, and list the residence for sale.

¶ 16      Claudette filed a section 508(b) fee petition requesting $4,987.50 in fees, as well as a petition for rule to show cause against Ernest due to his alleged noncompliance with the March 31 order. On May 28, 2025, the trial court entered an order granting Claudette's fee petition. On June 6, 2025, the court entered a finding under Supreme Court Rule 304(a) (eff. Mar. 8, 2016) that there was no just reason for delaying enforcement or appeal of the March 31 and May 28 orders.[1] Ernest now appeals from the court's orders of March 18, March 31, and May 28.

¶ 17                               II. ANALYSIS

¶ 18      Ernest argues (1) the trial court erred in finding he breached the MSA; (2) the court erred in directing a finding for Claudette; and (3) the proceeding was "fundamentally unfair" due to various procedural infirmities. We consider these contentions in turn.

---

[1] A 304(a) finding was necessary because Claudette's petition for rule to show cause was pending. See *In re Marriage of Gutman*, 232 Ill. 2d 145, 156 (2008).

¶ 19                                    A. Breach of the MSA

¶ 20          In interpreting the MSA, we apply general rules of contract construction. *In re Marriage of Hall*, 404 Ill. App. 3d 160, 166 (2010). Our primary objective is to effectuate the intent of the parties, and where the terms of the agreement are unambiguous, we determine the intent of the parties solely from the agreement. *Id.* The interpretation of a contract is a question of law that we review *de novo*. *Ritacca Laser Center v. Brydges*, 2018 IL App (2d) 160989, ¶ 15. Here, Ernest argues the MSA only required the residence to be listed for sale, not sold, and the temporary listing in 2012 satisfied his contractual obligations. This interpretation of the MSA is entirely without merit. The contract expressly provides the parties "shall cooperate in the effective completion of the sale by doing any and all acts and things necessary or proper to effectuate the sale of said real estate." This language clearly contemplates ongoing efforts by the parties to sell the residence until it is sold and the proceeds are divided equally between the parties. In contrast, Ernest kept the property unlisted for over 12 years and, in fact, transferred it into his own trust. Moreover, he did not execute a quitclaim deed transferring the property into joint ownership. Under these undisputed facts, the trial court correctly found he breached the MSA.

¶ 21          Ernest also argues the MSA was modified by the parties' verbal agreement that he could keep the residence (which, as noted, was listed for $239,900 in 2012) in exchange for Claudette keeping her $19,457.50 in IRA funds. Although parties to a written contract typically may modify its terms by a subsequent oral agreement (*Hannafan & Hannafan, Ltd. v. Bloom*, 2011 IL App (1st) 110722, ¶ 20), the MSA was not a freestanding contract but was incorporated into the judgment of dissolution. Under section 510(b) of the Act, the provisions of a dissolution judgment as to property disposition "may not be revoked or modified, unless the court finds the existence of conditions that justify the reopening of a judgment under the laws of this State." 750

ILCS 5/510(b) (West 2012); see *In re Marriage of O'Malley ex rel. Godfrey*, 2016 IL App (1st) 151118, ¶ 42 (discussing the trial court's jurisdiction to modify the parties' MSA). Ernest never sought to reopen the judgment to incorporate the alleged oral agreement between himself and Claudette. Accordingly, the court did not err in enforcing the terms of the judgment.

¶ 22     Additionally, the trial court found Ernest's allegation about the oral agreement lacked credibility and was directly contradicted by his own emails to Claudette in which he repeatedly demanded the IRA funds. Because the trial court has the superior vantage point to assess witness demeanor and credibility, we defer to the trial court's factual findings unless they are against the manifest weight of the evidence, *i.e.*, an opposite conclusion is apparent or the findings are unreasonable, arbitrary, or not based on evidence. *Toushin v. Ruggiero*, 2021 IL App (1st) 192171, ¶ 93. We agree with the trial court that Ernest's emails belie his claim of an oral agreement and find the court's credibility determination is not against the manifest weight of the evidence.

¶ 23                               B. Directed Finding for Claudette

¶ 24     Ernest next argues the court erred in directing a finding for Claudette under section 2-1110 of the Code of Civil Procedure (735 ILCS 5/2-1110 (West 2024)) because Claudette, as the movant, bore the burden of proof.

¶ 25     "The standard for determining whether a directed verdict is proper is whether all the evidence, when viewed in a light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand." *Romero v. Ciskowski*, 137 Ill. App. 3d 529, 533-34 (1985). "A directed verdict is also proper where there is some evidence supporting the nonmovant which loses its significance when viewed in the context of all the evidence." *Id*. at 534.

¶ 26    The instant case arose from Claudette's effort to enforce a judgment. However, based on Ernest's admissions at the hearing, the trial court correctly found as a matter of law that Ernest failed to comply with the judgment. After his noncompliance was established, the burden was on Ernest, not Claudette, to prove his affirmative defenses. *Young v. Wilkinson*, 2022 IL App (4th) 220302, ¶ 110 (the party who asserts an affirmative defense has the burden of proving it). In this procedural posture, the trial court properly assessed Claudette's motion for a directed verdict and considered the evidence to determine if Ernest carried his burden of proof as to his affirmative defenses. All of Ernest's affirmative defenses relied on a claimed oral agreement with Claudette, which his own emails contradicted, and which could not alter the property terms of the MSA without court approval. As stated above, once the MSA was incorporated into a judgment, it lost its contractual nature and could only be modified pursuant to section 510(b) of the Act (750 ILCS 5/510(b) (West 2012)). Under these facts, where Ernest's affirmative defenses crumbled entirely, the trial court did not err in directing a finding in favor of Claudette.

¶ 27                           C. Ernest's Procedural Claims of Error

¶ 28    Ernest argues the proceeding was "fundamentally unfair" because the trial court denied his request for a continuance to conduct discovery, did not enforce his request that Claudette appear at the hearing, and *sua sponte* found him in contempt of court without the procedural safeguards required for a contempt hearing.

¶ 29    A litigant does not have an absolute right to a continuance, and the decision to grant or deny a motion for continuance is within the trial court's sound discretion. *Illinois State Toll Highway Authority v. Chicago Title Land Trust Company*, 2021 IL App (1st) 200813, ¶ 48. Likewise, the trial court has broad discretion in ruling on discovery matters. *American Service Insurance Co. v. China Ocean Shipping Co. (Americas) Inc.*, 2014 IL App (1st) 121895, ¶ 15.

¶ 30    Here, we find no abuse of discretion in the trial court's denial of a continuance. On February 7, 2025, the trial court set the hearing for March 18, acting reasonably to expedite the matter due to the parties' advanced age and declining health. The parties had 39 days to prepare for the hearing, which was a routine motion to enforce a MSA. During that time, Ernest had full opportunity to issue requests for production, notice depositions, or issue subpoenas, but he did not avail himself of that opportunity. Instead, he waited until five days before the hearing, on March 13, to complain that "[n]o discovery has been conducted" and seek a continuance. Under those circumstances the trial court acted within its discretion to proceed with the hearing as planned.

¶ 31    Ernest further argues the trial court erred by not enforcing his request that Claudette appear at the hearing and be subject to cross-examination. However, Ernest made no offer of proof as to what Claudette's testimony would have been. He also waited to call her as a witness after the court had already directed the judgment.

¶ 32    It is well established that an erroneous evidentiary ruling will not support reversal unless the error was prejudicial and affected the outcome of the trial; a judgment will not be reversed if "no harm has been done." (Internal quotation marks omitted.) *Fellows v. Barajas*, 2020 IL App (3d) 190388, ¶ 16. An offer of proof would have enabled us to determine whether the exclusion of Claudette's testimony was erroneous and harmful to Ernest. *Wright v. Stokes*, 167 Ill. App. 3d 887, 891 (1988). Without one, we cannot determine the harm (if any) to Ernest. Nor can we envision any based on Claudette's affidavit in the record, where she expressly denied making any agreement whereby Ernest could keep the house. She also explained she was afraid of him, as she had been during their marriage, as documented by the entry of an emergency order of protection and subsequent agreed restraining order that prevented Ernest from communicating

with, threatening, or inflicting violence upon Claudette. In any case, Ernest, as the party seeking reversal, bears the burden of showing prejudice from the court's evidentiary ruling (*Fellows*, 2020 IL App (3d) 190388, ¶ 16), which he has not done. Accordingly, the trial court did not err in declining to require Claudette's testimony.

¶ 33    Ernest also claims the trial court wrongly found him in contempt of court *sua sponte* at the March 18 hearing. We agree, as did the trial court, which partially granted Ernest's motion to reconsider and vacated the contempt finding. This does not warrant reversal.

¶ 34    Lastly, Ernest argues that if we reverse the judgment in favor of Claudette, we must also reverse the award of fees to Claudette under section 508(b) of the Act. He raises no other contentions of error regarding the fee award. Since we are not reversing, we affirm the fee award.

¶ 35                              III. CONCLUSION

¶ 36    For the foregoing reasons, we affirm the judgment of the trial court.

¶ 37    Affirmed.